## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| MASTER LINK CORPORATION | CIVIL NO.: |
| Plaintiff | |
| v. | ACTION FOR PERMANENT INJUNCTIVE RELIEF; AND DAMAGES UNDER 42 U.S.C. § 1983 AND P.R. LAWS ANN. TIT. 31, § 5141 |
| PUERTO RICO ELECTRIC POWER AUTHORITY; VÍCTOR DE CASTRO; JUAN A. TIRADO CHABEBE; JORGE L. RIVERA MARTÍNEZ; MIGUEL DEL VALLE | |
| | PLAINTIFF DEMANDS TRIAL BY JURY |
| Defendants | |

## COMPLAINT

**TO THE HONORABLE COURT:**

**COMES NOW** Plaintiff, Master Link Corporation, through the undersigned attorneys, and very respectfully states and prays as follows:

## I.     NATURE OF THE ACTION AND JURISDICTION

1.1  This is an action based on the *de facto* debarment and blacklisting of Plaintiff Master Link Corporation, a corporation with a pre-existing commercial relationship and unblemished record with the corporate Defendant, from bidding for projects offered for bid by the Puerto Rico Electric Power Authority in retaliation for Plaintiff's exercise of free speech rights in connection with reports of environmental infractions to government agencies. The action also involves the termination of the pre-existing commercial relationship as a result of Plaintiff having exercised its free speech rights protected under the First Amendment to the Constitution of the United States of America. Such actions

1

have caused and will continue to cause irreparable harm and substantial damages to the Plaintiff.

1.2 The action seeks injunctive relief and damages for violation of Plaintiff's constitutional and civil rights arising out of arbitrary, capricious, irregular, and illegal actions by Defendant, the Puerto Rico Electric Power Authority and its agents and/or representatives, also included as Defendants, who abused their discretion in connection with the administration of a pre-existing commercial relationship and the bidding process concerning a series of projects of the Puerto Rico Electric Power Authority.

1.3 Defendants, in an arbitrary, capricious, irregular, and illegal fashion, abused their discretion, and conducted themselves contrary to law, regulations, and procedures, resulting in violations of Plaintiff's rights conferred by the First, Fifth and Fourteenth Amendments to the Constitution of the United States of America and Section 1 of the Civil Rights Act of 1871, as amended, 42 U.S.C. §1983. Plaintiff has not been given an opportunity to rebut the *de facto* debarment and blacklisting. Plaintiff seeks judgment and an award of damages against the Defendants for the actions taken by them in violation of clearly established statutory and constitutional rights which a reasonable person would have known.

1.4 This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) because the matters in controversy arise under the statutes of the United States of America, namely, Section 1 of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, and 28 U.S.C. § 1331 since the question of the violation of free speech rights and

denial of due process arise under the First, Fifth and Fourteenth Amendments to the Constitution of the United States of America.

1.5 Plaintiff also invokes this Honorable Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to entertain the Commonwealth law claims because these are so intimately related to the claims over which this court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

1.6  Venue is proper in this district pursuant to 28 U.S.C. § 1391 (b).

1.7  Plaintiff demands that all causes of action be tried before a jury.

## II.   PARTIES

2.1  Plaintiff, Master Link Corporation (hereinafter "ML" or "Plaintiff"), is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico. ML is authorized to do business in the Commonwealth of Puerto Rico and certified under the legislation and regulation applicable to Small and Medium Businesses known by its Spanish acronym "PYMES" (Pequeñas y Medianas Empresas). ML's physical and mailing addresses are: Carr. 2, Km 56.5, Bo. Palenque, Barceloneta, PR 00617; and PO Box 2186, Barceloneta, PR 00617, respectively. Plaintiff's telephone numbers are: 787-846-7654 and 787-846-7655; and fax number 787-846-7650.

2.2 Defendant the Puerto Rico Electric Power Authority (hereinafter "PREPA") is a corporate and political body. PREPA is a public corporation which is subject to the control of its Governing Board. See, Section 3, Law No. 83, May 2, 1941, as amended, P.R. Laws Ann. Tit. 22, §193. PREPA's physical address is NEOS Building, 1110 Ponce De León Ave., San Juan,

3

PR. PREPA's mailing address is PO Box 364267, San Juan, PR 00936-4267. PREPA's telephone number is 787-521-3434; fax number 787-521-4120. PREPA, as a corporate and autonomous body, has the power to sue and be sued in all courts. See, Section 6(e) of Law No. 83, May 2, 1941, as amended, P.R. Laws Ann. Tit. 22, § 196.

2.3 Pursuant to its organic statute, PREPA has authority to enter into contracts and any and all instruments necessary or convenient for the exercise of its powers. See, Section 6(f), Law No. 83, May 2, 1941, as amended, P.R. Laws Ann. Tit. 22, § 196.

2.4 Defendant Víctor de Castro is an employee and/or agent of PREPA. He is sued in his official and individual capacities. Because his personal address is unknown, the address of his employment is provided in paragraph 2.2 of the instant Complaint. His personal telephone number is 787-632-3413 and email address Vdecastro9769@aeepr.com.

2.5 Defendant Juan A. Tirado Chabebe is an employee and/or agent of PREPA. He is sued in his official and individual capacities. Because his personal address is unknown, the address of his employment is provided in paragraph 2.2 of the instant Complaint. His personal telephone number is 787-509-4797 and email address jtirado7950@aeepr.com.

2.6 Defendant Jorge L. Rivera Martínez is an employee and/or agent of PREPA. He is sued in his official and individual capacities. Because his personal address is unknown, the address of his employment is provided in paragraph 2.2 of the instant Complaint. His personal telephone number is 787-449-9676 and email address Jrivera8518@aeepr.com.

2.7 Defendant Miguel Del Valle is an employee and/or agent of PREPA. He is sued in his official and individual capacities. Because his personal address is unknown, the address of his

employment is provided in paragraph 2.2 of the instant Complaint. His personal telephone number is 787-632-3413 and email address mdelvalle12321@aeepr.com.

### III.    THE FACTS

**The pre-existing commercial relationship and the retaliatory notice of default and termination**:

3.1 On January 3, 2011, PREPA and ML entered into Contract 2011-P00067 for the construction of a building to establish a power station for the Municipality of Culebra.

3.2 Following several procedures, PREPA issued an order to proceed on February 1st, 2012, and set February 13, 2012 as the date of commencement. The order to proceed provided for a 240 calendar day construction schedule. The date of termination, as per the schedule, was October 10, 2012.

3.3 During the initial stage of construction (demolition) and after the demolition activity, ML detected a strong and offensive hydrocarbon odor. After conducting tests, the presence of material contaminated with hydrocarbons was confirmed. The presence of the contaminated material created a controversy between the representatives of ML and PREPA with authority over the project, including the individual Defendants.

3.4 PREPA's representatives, including Defendants Víctor De Castro, Juan A. Tirado Chabebe, Jorge L. Rivera Martínez, and Miguel Del Valle, were requiring ML to act in accordance with their instructions, which contravened environmental laws and established norms and procedures, ignoring the obligation to report and consult the Environmental Quality Board of the Commonwealth of Puerto Rico ("EQB") with regards to the findings and their consequences.

3.5 The aforementioned representatives of PREPA proposed to ML that the contaminated material be deposited by ML in the municipal landfill of the Municipality of Culebra.

3.6 The representatives of ML knew and repeatedly told Defendants during the meetings held that the municipal landfill did not have the required approval from the EQB to receive and deposit contaminated material. Such landfill had not been certified by the EQB.

3.7 Defendants, on repeated occasions, provided ML and the Municipality of Culebra with false information in order to induce ML to participate in unlawful actions, attempting to force ML to dispose of the contaminated material in the Culebra landfill.

3.8 Repeatedly, ML provided verbal and written information on the correct way to dispose of the contaminated material in accordance with the regulations of the EQB.

3.9 ML's representatives reported to and consulted with the EQB, which intervened in the matter and required that the situation be entertained in accordance with the applicable laws and regulations. The EQB required that a sampling be conducted in order to determine if there was contamination in the site and its levels.

3.10 Once the contamination was confirmed, the EQB ordered the removal of the contaminated material and its deposit in an industrial landfill in mainland Puerto Rico or "Big Island" ("Isla Grande"), not in the municipal landfill, as the PREPA representatives had illegally instructed.

3.11 During the meetings held with PREPA's representatives, the individual Defendants included, ML was let known at all times by the Defendants themselves that they were displeased and annoyed by ML's communications/reports to EQB on the environmental infractions and the

instructions given to ML by Defendants in connection with the removal and illegal deposit of the contaminated material.

3.12 Following these incidents, Defendants countered and a pattern of arbitrary and capricious conduct ensued against ML in the administration of the Contract and resulted in the *de facto* debarment of ML.

3.13 Appendix 4, item 1, of the Contract establishes that if contaminated material was found at some point, it would be the contractor's responsibility to conduct the removal and disposition of such material in an industrial landfill. Although ML submitted a proposal for the removal of the contaminated material, PREPA refused to negotiate in good faith and decided to conduct such work with a subcontractor. PREPA ignored all alternatives presented by ML, in clear violation of the terms of the Contract.

3.14 On June 26, 2012, ML took its objection to the first level, as established in Article 35 (Disputes) of the Contract, by directing a communication to PREPA's Director of Engineering. The objection fell on deaf ears and was not entertained.

3.15 On July 11, 2012, ML took its concerns to the second and ultimate levels, by way of a communication directed to the Executive Director. Once again, ML was ignored.

3.16 On July 31, 2012, ML followed up on its June 26, 2012 letter to no avail.

3.17 On October 27, 2012, without demobilizing ML from the project, PREPA commenced the removal and disposition of the contaminated material by subcontracting another supplier. This action drastically affected ML's work plan in the site.

3.18 ML was instructed by PREPA to store in the worksite any and all material that could not be removed by the subcontractor as a result of its limited resources. This interfered with the

work being performed by ML and resulted in a stay of the operations, producing significant losses for PREPA, the Commonwealth of Puerto Rico, and its taxpayers. As a result thereof, the project was delayed for more than two (2) years, the time that it took PREPA to remove all the contaminated material. ML, in its proposal to PREPA, had committed itself to remove the contaminated material in just fourteen (14) calendar days.

3.19 During the course of the project, forty two (42) change orders were issued, adding and deleting work from the scope of work of the Contract. As of today, thirty-one (31) additional change orders have not been signed. These do not include other changes that were not evaluated and that delayed the project in excess of seven hundred fifty-one (751) calendar days as of October 31, 2014, when the Contract expired. This delay represents an increase in additional time of 313% in comparison with the timeline established in the Contract.

3.20 Through a written communication dated January 29, 2014, PREPA committed itself to execute an amendment by the last week of March of 2014. Nevertheless, in an unjustified and arbitrary fashion, PREPA delayed the delivery of the amendment until June 30, 2014, notwithstanding the fact that these changes had been quantified, approved, and others had been performed.

3.21 PREPA, through the individual Defendants, has acted in clear violation of the terms of the Contract and the applicable regulations and statutes by requiring ML to continue working in the project without having been provided with an approved change order to cover the additional costs related to the same and without being provided with compensation for the delay of the project caused by PREPA.

3.22 The aforementioned delays caused ML to submit a partial change order for extended overhead in accordance with Article 37 (Changes) of the Contract. The total costs increased to $691,709.41 for a delay of 192 days recognized and accepted by PREPA in a communication dated December 21, 2012. This impact only covers until April 19, 2013, and does not consider interests accrued since the day of its presentation.

3.23 Due to PREPA's refusal to recognize the change order in question related to the extended overhead, on December 27, 2013, ML took its complaint to the first level of dispute resolution in accordance with the terms of the Contract. The first level rejected ML's claim.

3.24 For said reason, on February 8, 2014, ML took its claim to the second and ultimate level, directly to the Executive Director of PREPA.

3.25 Through letter dated March 3, 2014, ML provided PREPA with the reasons and mutual conveniences of a demobilization and requested that it be provided a meeting to discuss the matter. ML requested a meeting by way of letters dated March 3, 19 and May 9, 2014. ML was ignored and was not afforded an audience.

3.26 Due to PREPA's refusal to provide ML with a meeting, ML reiterated its explanation, by way of a letter dated May 19, 20, and 25, and May 9 and 20, 2014, providing the details, reasons, and mutual conveniences of a demobilization. Demobilization was the correct path since ML had taken the project to a stage of substantial completion and only a series of change orders that had not been approved by PREPA, which impeded the completion of the project, were pending.

3.27  The purpose of the demobilization was to avoid expenses to PREPA and allow the parties to meet in order to discuss the remaining change orders so that they could be included in

9

just one change order, allowing for the efficient performance in accordance with ML's work plan and avoiding additional extended overhead.

3.28 PREPA conveyed to ML that it could conduct a demobilization of the project if it performed four (4) specified activities. Such activities were performed, accepted, and paid for, except for the painting of certain louvers, equivalent to 0.44% of the project. The payment for the louvers would be satisfied upon the completion of the work subject of the amendment.

3.29 In spite of the aforementioned, PREPA, through the individual Defendants, alleged that ML conducted an unjustified and unauthorized demobilization as a pretext to justify the unjustifiable.

3.30 On August 8, 2014, a meeting called by Eng. Leandro Faura, who was in charge of Risk Division of PREPA, was held. MAPFRE's representatives, the surety company of the project, participated in the meeting. There, certain preliminary agreements were reached, including PREPA's acceptance to negotiate charges related to extended overhead, mobilization, and demobilization, among others.

3.31 Notwithstanding these preliminary agreements, on October 16, 2014, ML received a letter dated October 7, 2014, from the Executive Director of PREPA declaring ML in default.

3.32 PREPA declared ML in default in a surprising, unilateral fashion and contrary to the evidence contained in the administrative record. PREPA, without valid grounds, ignored ML's objections. PREPA decided not to engage in communications which could have allowed the parties to clarify any controversies. PREPA disregarded the terms and conditions of the Contract with ML by engaging in malicious, arbitrary and capricious conduct. PREPA declared ML in

10

default in violation of the clear terms of its own regulations, which establish the procedures to be followed in situations such as the one present here.

3.33 The notice of default was issued in violation of the terms of the Contact which provide for due process in such circumstances.

3.34 The Contract clearly establishes that PREPA can only terminate the Contract if the contractor fails to comply with its obligations and does not remediate such noncompliance within a term of thirty (30) days after receiving written notice from PREPA. The Contract provides for an extension of such term if necessary.

3.35 The notice of default by the Executive Director and the employee charge of Supplies does not provide notice of lack of compliance. It only included the unilateral determination and did not provide ML with a term to correct any noncompliance. The determination failed to follow the process established in the Contract, a pre-existing commercial relationship, in a capricious, arbitrary and unilateral fashion.

3.36 On July 26, 2013, PREPA, through its Executive Director, Eng. Juan Alicea, approved a new revised procedure for claims to insurance companies for noncompliance of contractors.

3.37 The procedure establishes, in a detailed fashion, the duties of PREPA's employees in the process and the moment to exercise such duties. PREPA grossly disregarded such procedures in issuing the notice of default:

(a) Item J, Section III General Provisions establishes that the progress report form (AEE-700.0-429 General Status Inquiry) is used to report the progress of the project and shall be completed periodically by the employee in charge of the project. The

11

original has to be sent to the surety company with copy to the person in charge of Supplies, the Treasurer, and the Office of Risk Administration throughout four (4) stages of the project: upon completion of 20%, 50%, 75%, and 100%. In the projects with environmental implications the recommendations of the Official of Labor Security and/or the Division of Environmental Protection and Quality Assurance should be included. The surety company never received any such reports as required.

(b)     Item 3, Section IV, provides that the person in charge of the project will meet with the contractor to complete the required progress report under Item J, Section III of the General Provisions. The project administrators never met with ML personnel to complete the report required under the procedure.

(c)     Item 7, Section IV, establishes that the person in charge of the project will request the Director of the Division of Supplies to coordinate the meetings with the contractor to discuss any noncompliance with the terms and conditions of the contract. The project administrators, the individual Defendants Rivera Martínez and Del Valle, refused to meet and did not allow a meeting with ML to take place, in spite of ML's multiple requests and suggestions to that effect. With its conduct, PREPA implicitly recognizes that it has failed to comply with the terms and conditions of a pre-existing commercial relationship.

(d)     Section IV, items 3,9,13,14,15,19,20,21, establish the duties of the Supplies Director to finally determine if ML would be declared in default. The Director of Supplies could not perform such duties inasmuch as the project administrator never

provided notice of any situation whatsoever with ML and kept him ignorant of all the controversies.

The procedure established by PREPA was never complied with because the project administrators never followed the steps required to declare a contractor in default in gross disregard of their duties as public administrators. On several occasions, ML communicated with the office of the Director of Supplies and notified its availability to meet in order to explore solutions in relation to the situations the project was experiencing.

3.38 On October 21, 2014, ML requested an argumentative hearing before PREPA, submitted in chronological order a series of events and the delays attributed to PREPA, not ML, and requested reconsideration of the notice of the default determination. No response whatsoever was received.

3.39 On October 30, 2014, ML sent a follow up letter to the October 21 communication, whereat, once again, it requested an argumentative hearing and reconsideration, while simultaneously recommending that the parties resolve the disputes via arbitration and that the Contract be extended until the parties reached an agreement. In this letter, ML included an analysis of the project that shows that it was at a substantial completion stage. The communication was not entertained by PREPA, no response was received.

**The unconstitutional *de facto* debarment and blacklisting of ML:**

3.40 On October 24, 2014, ML received a letter dated October 22, 2014 from the Director of the Supplies Division of PREPA, Mr. Lloel Muñoz, suspending ML from the Registry of

Suppliers for a six (6) month period based on the October 7, 2014 notice of default issued by the Executive Director of PREPA.

3.41 The Bid Registration, Section 2 (General Provisions), item d (Breach of Contract), sub item 2, establishes that the suspension of a contractor from the Registry of Suppliers of PREPA is limited to a term of not less than three (3) months depending on the merits of the case. During the past eleven (11) years, ML has provided a service of excellence to the PREPA with an unblemished record and never before had it been declared in default. Nevertheless, PREPA decided to suspend ML for a six (6) month period, double the minimum term established by the Regulation, as a pretext for ML's exercise of its rights under the First Amendment.

3.42 In spite of PREPA's disregard of its own established procedures, as detailed in the preceding paragraphs, on November 5, 2014, PREPA notified MAPFRE and made a claim for the alleged default of ML. PREPA officially requested MAPFRE to initiate the execution process of the bond. Once the surety company receives the claim, it initiates an investigation which includes experts and attorneys to evaluate the claim, which represent significant and onerous costs to be paid by ML, as established in the surety contract with MAPFRE. It is estimated that the investigation process could take four (4) months to determine whether a claim against the surety proceeds or not.

3.43 If PREPA decides to subcontract the work with another company, the expenses to complete the project would be charged to ML. A great difference exists between what it would cost ML to complete the project versus what it would cost a new contractor.

3.44 Given the fact that ML had not been given a hearing prior to the default being determined and implemented, ML requested an administrative hearing and requested that the

14

debarment be held in abeyance until the matter was resolved. The hearing request was assigned to an administrative law judge but the matter was never resolved in the administrative procedure. Meanwhile, the six (6) month suspension term expired. During the whole six (6) month term, PREPA maintained ML status as a bidder suspended from the Bidder Registry.

3.45 As of October 7, 2014, when ML was declared in default of the contract through the letter received on October 16, 2014, PREPA owed ML the following amounts:

    a) $225,514.39 for work performed and agreed, but left unsatisfied by PREPA delaying the amendment to process the payment.

    b) $235,069.08 for retained earnings notwithstanding the fact that what was pending was work worth $146,013.51, that PREPA refused to satisfy.

    c) $25,180.23, amount established for the demobilization and that PREPA has refused to recognize or pay.

    d) $691,709.41 for the extended overhead change order which had been pending for close to a year at the ultimate level.

3.46 The aforementioned amounts do not include a second request for an extended overhead change order. ML, as in its first extended overhead claim, retained the services of an expert to determine the additional time to which it is entitled to. The report of time impact was submitted on October 29, 2014, to PREPA. The summary of time impact submitted by the expert concludes that ML is entitled to a total of 710 calendar days assuming that the last change order was signed on September 30, 2014, with a completion date of March 31, 2015, and taking into consideration the time it would take to receive the necessary materials that would result from the last change order to complete the remaining work.

3.47 The payment for certifications performed by PREPA did not comply with the schedule established by the Contract. The Contract establishes a term of no more than sixty (60) days to submit the certification for payment. Notwithstanding such term, the payment average was 108.5 days in spite of multiple efforts by ML.

3.48 This delay in payments represents additional costs in interests that amount to $18,500.00.

3.49 Article 13.2 of the Contract establishes the maximum amount of time allowed to evaluate and pay the certifications. Any delay in excess of what was agreed is a violation of the established terms. PREPA failed to comply with the terms of the Contract in seventeen (17) of the eighteen (18) submitted certifications.

3.50 The economic impact of the delays quantified in the second extended overhead change order represent an approximate additional amount of $1,846,000.00.

3.51 The effect of PREPA's inaction by refusing to entertain, with the diligence required, the change orders submitted and recognized, and by refusing to express itself with regards to the extended overhead change order has caused significant damages to ML and its finances, reducing its cash flow to the point that ML has been required to enter into a Loan Agreement in the amount of $925,600.00 with a 9.49% interest rate, with the Commercial Equipment Finance Company (CEFI) to correct the deficit that was not contemplated and unnecessarily caused by PREPA in order for ML to be able to respond to its materialists and suppliers.

3.52 The collateral effect of having been suspended from the Registry of Suppliers is highly prejudicial to ML given that 95% of the work performed by ML is from contracts with PREPA.

3.53 At all times, PREPA acted through the individual Defendants, all of whom intervened in the adverse actions taken against ML. The actions against ML were taken, as previously explained, because ML failed to follow the instructions given to it by the individual Defendants with regards to the removal and deposit of the contaminated material and exercised its freedom of speech by reporting the environmental infractions to the EQB.

3.54 Had ML followed the individual Defendants instructions, in clear violation of the applicable laws and regulations, the citizens of Culebra and the environment would have suffered grave damages.

3.55 Defendant Rivera Martínez was the Administrator of the Culebra project as Superintendent of the Department of Project Management in the Directorate of Generation. Defendant Del Valle was Rivera Martínez aide or Assistant in the management of the project as Senior Engineer Supervisor in the Department of the Management of Projects.

3.56 Defendant Tirado Chabebe, as the person in charge of the Engineering Division, was Rivera Martínez's superior and, at all times, has been informed, has participated and approved the conduct of his subordinates, the aforementioned Defendants.

3.57 Defendant De Castro was the Supervisor of the Environmental Section of the Division of Generation and, as such, intervened in the controversy in connection with the removal and disposition of the contaminated material, together with Defendants Rivera Martínez and Del Valle.

3.58 At present time, and at the time when the Executive Director signed the notice of default which led to the termination of the Contract and the *de facto* debarment, Defendant De Castro was and is in a trust position and was and is an adviser of the Executive Director with

17

whom he directly works with. As such, he directly intervened with the default and debarment determinations.

3.59 At some point, during the execution of the Contract, all of the individual Defendants communicated to ML that they were displeased and annoyed because ML had exercised its freedom of expression or speech in connection with the environmental infractions.

3.60 The capricious and arbitrary conduct is personal in nature and has caused and will continue to cause severe damages to ML, threatening its existence.

3.61 All of the Defendants acted in a concerted fashion to deprive Plaintiff of its rights protected by the Constitution.

3.62 The default charges pursuant to which PREPA terminated the Contract and debarred ML are false, but ML has not been given adequate notice of the same nor an opportunity to refute them prior to the suspension being carried out.

3.63 Against this backdrop of rumor and innuendo, ML has been disqualified from different bids, some of which are detailed below. The Defendants' conduct constitute a debarment and blacklisting of Plaintiff from contracting with PREPA and other public entities, which will continue to affect ML permanently as a firm that allegedly failed to comply with a government contract.

3.64 After the initial notice suspending ML from the Bidder Registry, ML received notice of a second suspension from the Bidder Registry for an additional one year term.

3.65 For the second suspension, Defendants provided no pre-deprivation or post-deprivation hearing on the suspension and excluding ML from participating in bids, requests for proposals, and other requests for services.

3.66 As of today, this second *de facto* debarment continues to be in effect.

3.67 As a result of the retaliatory *de facto* debarments and blacklisting, ML has been denied participation in the contract procurement process andfr access to information that is available to other contractors and prospective contractors/bidders.

3.68 ML was not considered in spite of the fact that it was the lowest bidder participating in the process for Bid No. RFP00398. For said Bid, ML's quote was for approximately $75,000.00. The funds expended by ML to prepare and submit the proposal for such project was approximately $2,000.00.

3.69 For Bid No. RFQ45128, an Adjudicative Judge for PREPA favored ML for the underlying project. However, the Bid Committee has appealed the decision to the Puerto Rico Court of Appeals. In connection with this Bid, ML quote was for $5,317,000.00. ML had costs of approximately $12,000.00 for the preparation and submission of the proposal.

3.70 PREPA's Bid Committee did not consider ML's price for Bid No. RFQ00310 because ML had been taken out of the Bidder Registry. For this Bid, ML's quote was of $1,319,000.00. ML invested $3,500.00 in the preparation and submission of the proposal.

3.71 ML participated in the procurement process for Bid No. RFP00391 as a subcontractor for another company, Wide Range Corporation. Notwithstanding the fact that Wide Range Corporation was the lowest bidder participating, it was declared nonresponsive because ML was not in the Bidder Registry.

3.72 In connection with another project, the reparation of Buoy No. 4 in Aguirre, ML was denied access to the PowerAdvocate Intelligence platform, a system used by PREPA to conduct

sourcing events for a wide variety of equipment, materials and services. Due to the retaliatory debarment and blacklisting of ML, Plaintiff was not allowed to evaluate the costs of the project.

3.73 ML was denied access to information for the rental of a 240 ton water crane for the Aguirre Plant in the PowerAdvocate Intelligence platform. Due to the retaliatory debarment and blacklisting of ML, Plaintiff was not allowed to evaluate the costs of the project. However, based on ML's experience in the industry, it is estimated that the cost would have been approximately $10,000.00 per month for the rental.

3.74 ML was also denied access to the PowerAdvocate Intelligence platform for RFP Digital Control System (DCS) SJ GIS. Due to the retaliatory debarment and blacklisting of ML, Plaintiff was not allowed to evaluate the costs of the project. Based on ML's experience in the industry, it is estimated that the profits would have been 20% of the budget for the RFP.

3.75 After ML's debarment, in the bid documents for RFP00485 and RFP00516, a note was included specifying that PREPA will not consider bidders with subcontractors that have been suspended or that are not included in the Bidder Registry. These bids are for the yearly rental of a Manlift, which, based on ML's experience in the industry, could be estimated in $36,000.00 for each one of the bids.

3.76 ML was given no valid ground for its debarments and no opportunity to refute any such grounds. Such a debarment implicates the due process clause of the Fifth Amendment to the Constitution of the United States of America and require, at a minimum, proper notice to the contractor of the charges on which the debarment is based and an opportunity afforded to the contractor to refute those charges. No such notice was issued in this case and no such opportunity granted.

20

3.77 The debarments and blacklisting of the Plaintiff violate the due process clause of the Fifth Amendment, applicable to the states under the Fourteenth Amendment, and must be set aside.

3.78 The acts of the individual Defendants caused ML to be debarred from contracting for future contracts.

3.79 The pretextual default declaration and debarments go to the very heart of ML's professional competence. Such statement permanently stigmatizes ML.

3.80 The *de facto* debarment based on the pretextual default modified ML's status and places a great burden on its future contracting prospects.

3.81 As a direct result of Defendants' misrepresentations, ML has been deemed a non-responsible bidder and has suffered a *de facto* debarment from contracts with PREPA.

3.82 The *de facto* debarment, blacklisting and non-responsibility determination places a great burden on ML since the information has been disseminated to other public entities and third parties such as the surety company and people in the industry that participate in the bidding process. Plaintiff has been *de facto* debarred from successfully bidding in future contracts.

3.83 As a direct result of Defendants' conduct, ML's bonding capacity has been significantly reduced from $15,000,000.00, before the retaliatory notice of default, blacklisting, and *de facto* debarments, to $6,000,000.00, excluding it from participating or contracting in projects of greater magnitude, reducing its income capacity.

3.84 The non-responsibility or default determination resulted from the defendants' false and defamatory statements regarding ML's performance on the project.

3.85 The actions taken by Defendants were undertaken with the intent to punish ML for reporting environmental infractions to public agencies in accordance with its obligations and free speech rights under the First Amendment to the Constitution of the United States of America.

3.86 The *de facto* debarments affirmatively disable or restraint ML in doing business.

3.87 The actions by the Defendants have no valid purpose.

3.88 The actions by the Defendants in blacklisting ML and *de facto* debarring it are certain to have the effect of persuading other agencies and instrumentalities of the Government of Puerto Rico to take similar actions against ML as a contractor.

3.89 Plaintiff cannot be fully compensated by a damages award in this action. If ML continues to be blacklisted and debarred from bidding for future projects, the damages will be of such magnitude that ML could easily disappear. This would result in the loss of employments and the inability to comply with ML obligations with subcontractors, materialists, suppliers, etc.

3.90 Defendants did not afford ML any pre-termination opportunity to be heard or to defend in any way against the declaration of default in a pre-existing commercial relationship and the subsequent blacklisting and *de facto* debarments.

3.91 Defendants have acted in bad faith.

3.92 As an independent contractor, ML's contractual relationship with PREPA cannot be terminated in retaliation for exercising its free speech rights under the First Amendment.

3.93 The substantial and motivating factor in the termination and *de facto* debarments of Plaintiff was ML's exercise of its free speech rights.

3.94 ML has a protected property and/or liberty interest in the terminated contract and in the certification allowing it to bid for contracts with PREPA and the Government of Puerto Rico.

3.95 Plaintiff is a person protected by the Fifth Amendment and Puerto Rico is considered a state for 42 U.S.C. §1983 purposes.

3.96 Before ML can be deprived of its property and/or liberty interest it is entitled to the due process of law required by the Fifth Amendment. Plaintiff is also entitled to the equal protection of the law required by the Fourteenth Amendment.

3.97 ML has a legitimate claim of entitlement to the terminated contract and its status as a responsible bidder for future contracts.

3.98 By debarring ML without affording it even the minimal due process rights to which it lawfully is entitled to, Defendant PREPA and the remaining individual Defendants, have, under color of state law, deprived ML of its due process rights and privileges secured under the Fifth and Fourteenth Amendments to the Constitution of the United States of America, causing ML significant damages. Defendants have singled out ML solely for having exercised its freedom of expression or speech in violation of the equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States of America.

3.99 The notice of default, the termination of the existing Contract for having exercised rights secured by the First Amendment and the *de facto* debarments have been specifically intended to injure ML in a way that cannot be justified by any valid interest.

3.100  Defendants' conduct is so egregious that it shocks the conscience.

3.101 The default determination and *de facto* debarments create a presumption of non-responsibility for the award of any future contracts. Defendants have provided the false information with the knowledge that doing so would yield (and with the intention to yield) findings of non-responsibility and negative results in the future.

## IV. FIRST CAUSE OF ACTION
### (First Amendment)

4.1  Plaintiff repeats and incorporates each and every preceding allegation as if fully set herein.

4.2  The notice of default, the termination of the pre-existing commercial relationship and the *de facto* debarments in retaliation for ML having exercised its free speech rights constitute a violation of the First Amendment.

4.3 These actions violate clearly established statutory and constitutional rights of Plaintiff which a reasonable person would have known.

4.4 The individual Defendants have no immunity from the consequences of their actions as asserted in the instant Complaint.

4.5  Defendants are liable to Plaintiff under this cause of action for all damages caused as a result of their unlawful conduct.

4.6 As a result of Defendants' actions, ML has been damaged in amounts for which it seeks relief in the Wherefore of the Complaint.

## V. SECOND CAUSE OF ACTION
### (Due Process of Law)

5.1  Plaintiff repeats and incorporates each and every preceding allegation as if fully set herein.

24

5.2 The notice of default, termination of the pre-existing commercial relationship, and *de facto* debarments and blacklisting of the Plaintiff implicate property and/or liberty interests.

5.3 Defendants' failure to follow the mandate of its own rules and procedures governing the execution of projects and procurement process resulted in the unconstitutional deprivation of ML's property and/or liberty interests as a contractor and bidder.

5.4 Such actions were taken without due process of law violating clearly established statutory and constitutional rights of Plaintiff which a reasonable person would have known.

5.5 The individual Defendants have no immunity from the consequences of their actions as asserted in the instant Complaint.

5.6 As a result of Defendants' actions, ML has been damaged in amounts for which it seeks relief in the Wherefore of the Complaint.

## VI. THIRD CAUSE OF ACTION
### (Tort Action for Defamation)

6 .1  Plaintiff repeats and incorporates each and every allegation as if fully set herein.

6 .2  Article 1802 of the Puerto Rico Civil Code, PR Laws Ann. Tit. 31, sec. 5141, provides relief in damages for tortious conduct.

6 .3 The false statements of default by ML and non-responsible bidder status, which resulted in the debarring and blacklisting of ML have been published to third parties.

6 .4 The statements, debarring and blacklisting ML were made with knowledge of their falsity. Publishing knowing false and defamatory statements about ML intended to injure Plaintiff in its trade and business, including all statements that led to the termination and debarments of ML.

25

6 .5 Plaintiff is entitled to damages under Article 1802 of the Puerto Rico Civil Code in amounts detailed in the Wherefore of the Complaint.

## VII. FOURTH CAUSE OF ACTION
### (Damages for Breach of Contract)

7.1  Plaintiff repeats and incorporates each and every preceding allegation as if fully set herein.

7.2  As a result of Defendant PREPA's breach of contract, under Article 1077 of the Puerto Rico Civil Code, ML is entitled to seek redress from Defendant PREPA for contractual damages.

## VIII. FIFTH CAUSEOF ACTION
### (Equal Protection of the Laws)

8.1 Plaintiff repeats and incorporates each and every preceding allegation as if fully set herein.

8.2 Defendants intentionally singled out ML solely for having exercised its rights under the First Amendment to the Constitution of the United States of America.

## IX. SIXTH CAUSE OF ACTION
### (Permanent Injunctive Relief)

9.1 Plaintiff repeats and incorporates each and every preceding allegation as if fully set herein.

9.2 ML's involvement in PREPA's projects represents a significant portion of its business and revenues (95%).

9.3 If Defendants are not permanently enjoined from arbitrarily terminating pre-existing commercial relationship, noncomplying, debarring and blacklisting the Plaintiff, ML could disappear.

9.4 Without enjoining Defendants from actions such as the ones described in the preceding paragraphs, ML will be debarred from participating in bid processes of other agencies,

instrumentalities and/or public corporations of the Commonwealth of Puerto Rico inasmuch as it has been blacklisted as a non-responsible bidder in the eyes of PREPA, third parties, including other agencies, instrumentalities, public corporations, peers of the industry, surety companies, among others.

9.5 Defendants failed to comply with their duty to assure compliance with the First, Fifth, and Fourteenth Amendments to the Constitution of the United States of America in the termination of a pre-existing commercial relationship and debarment of ML in retaliation for having exercised its freedom of speech and without due process of law.

9.6 ML is entitled to seek judgment under the Declaratory Judgment Act and the First, Fifth, and Fourteenth Amendments to the Constitution of the United States of America holding that the Defendants violated ML's constitutional rights in the termination and debarment in retaliation for the exercise of its free speech rights and without due process of law and by singling out ML solely for having exercised its rights under the First Amendment. No other bidder was *de facto* debarred for having exercised its freedom of speech.

9.7 ML is entitled to injunctive relief against all Defendants setting aside the illegal termination, debarments and blacklisting and requiring that ML be allowed to terminate the work contracted and be reinstated to the position it was in before the retaliatory debarments and blacklisting, and that all work denied to ML be restored to ML as if the termination and debarments had not occurred.

9.8 Defendants have clearly and willfully ignored the requirements of PREPA's own norms and procedures and the applicable law and regulations in declaring ML in default, terminating the pre-existing commercial relationship, debarring and blacklisting Plaintiff. Injunctive relief is

warranted, ordering all Defendants to comply with their duties and obligations in the execution of contracts and procurement process.

9.9 Public interest will be furthered if injunctive relief is granted inasmuch as there is a public interest in ensuring that no environmental infractions be committed and that no impropriety be allowed in the award of contracts with PREPA. It is in the best public interest for PREPA and its agents to abide by Defendants' contractual and legal obligations in the execution of contracts and the bidding process for the benefit of the Commonwealth of Puerto Rico and its taxpayers.

9.10 It is also in the public interest to disallow unfettered discretion to abuse powers and responsibilities of PREPA and its agents in debarring potential bidders, thus restricting competition.

9.11 The public interest will not be injured if injunctive relief is granted.

9.13 In consideration of the interests involved, the injuries and prejudice to ML if injunctive relief is not granted greatly outweigh any hardship which may be alleged by PREPA or Defendants. There will be no harm to Defendants if the injunctive relief sought is granted, given that what is being requested is for Defendants to be ordered to comply with their legal obligations under the law and the Constitution.

## X. SEVENTH CAUSE OF ACTION
### (Attorneys Fees and Interests)

10.1    Plaintiff repeats and incorporates each and every preceding allegation as if fully set herein.

10.2    Plaintiff is entitled to attorneys' fees under the statutes invoked in the Complaint, 42 U.S.C. §1988, and to pre and post-judgment interest.

**WHEREFORE,** all premises considered, ML respectfully prays that judgment be entered

in its favor including the following relief:

A.   A declaration that Defendants violated ML's constitutional rights in the termination and debarments in retaliation for the exercise of its free speech rights, without providing due process of law and in violation of the equal protection of the laws.

B.   Ordering Defendants to allow ML to complete the works related with the Culebra contract that was illegally terminated based on a pretextual notice of default, blacklisting Plaintiff as a non-responsible contractor/bidder.

C.   Ordering Defendants to fairly consider ML bids for any of PREPA's projects put out for bids in the future.

D.   Ordering Defendants to set aside the notice of default, *de facto* debarments and the blacklisting of Plaintiff as a non-responsible contractor/bidder.

E.   Awarding ML the amounts owed to it under the illegally terminated contract and any amounts to what it was entitled to had it been allowed to complete the project, amounting to not less than $3,613,814.00 considering interests until June 30, 2015, plus additional pre and post-judgment interests to be determined.

F.   Awarding ML damages against Defendants in an amount of not less than $ 3,000,000.00 for the violation of Plaintiff's constitutional rights.

G.   Awarding ML damages against Defendants in an amount of not less than $2,000,000.00 for defaming Plaintiff.

H.   That any award for damages be against all Defendants, jointly and severally, for all injuries alleged in the Complaint.

I.   Imposing punitive damages against the Defendants in an amount of not less than $1,000,000.00, for each one, in order to deter them from engaging in similar conduct in the future, given that they have acted in willful, intentional disregard of the Constitution or federal laws.

J.   An award of reasonable attorneys' fees, together with costs, litigation expenses, and necessary disbursements.

K.   Any other remedy which this Court may deem just and proper.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 14th day of June, 2015.

**S/ALBERTO OMAR JIMÉNEZ-SANTIAGO**
Alberto Omar Jiménez-Santiago
USDC-PR No. 122209
PO Box 191802
San Juan, Puerto Rico 00919-1802
Tel.: (787) 640-6504 ▪ Fax (787) 253-7192
e-mail: albertoomarjimenez@msn.com

**S/ CARLOS E. CARDONA-FERNÁNDEZ**
Carlos E. Cardona-Fernández
USDC-PR No. 217806
PO Box 810412
Carolina, PR  00981-0412
Ph. (787) 550-9280 ▪ Fax: (787) 768-1132
e-mail: **carloscardonafe@hotmail.com**